**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

CHERYL ANN SNYDER,

      Plaintiff,

      v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

      Defendant.

No. 14 C 4691

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Cheryl Ann Snyder filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her applications for Disability Insurance Benefits under Title II of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and Plaintiff has filed a request to reverse the ALJ's decision and remand for additional proceedings. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover Disability Insurance Benefits (DIB), a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp.

2d 973, 977 (N.D. Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The standard for determining DIB is virtually identical to that used for Supplemental Security Income (SSI). *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB on May 24, 2011, alleging that she became disabled on October 23, 2009, because of fibromyalgia, rheumatoid arthritis, and osteoarthritis. (R. at 18, 87, 195). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 18, 79–81, 87–92, 102–12). On November 7, 2012, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 18, 40–78). The ALJ also heard testimony from GleeAnn L. Kher, a vocational expert (VE). (*Id.* at 18, 68–77, 150).

The ALJ denied Plaintiff's request for benefits on November 28, 2012. (R. at 18–34). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff has not engaged in substantial gainful activity since October 23, 2009, the alleged onset date. (*Id.* at 20). At step two, the ALJ found that Plaintiff's osteoarthritis, fibromyalgia, spine disorders, hypothyroidism, chronic obstructive pulmonary disease, and obesity are severe impairments. (*Id.*). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of any of the listings enumerated in the regulations. (*Id.* at 22–23).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[2] and determined that she can perform light work except for "no climbing of ladders, ropes, or scaffolding; occasional crouching, stooping and climbing of ramps and stairs, oc-

---

[2] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

casional exposure to temperature extremes and other respiratory irritants such as fumes, gases and dust; and occasional handling and fingering with the dominant right upper extremity (RUE)." (R. at 23). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is unable to perform any past relevant work. (*Id.* at 32). Based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including rental clerk, counter clerk, and usher. (*Id.* at 32–33). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability, as defined by the Act. (*Id.* at 33–34).

The Appeals Council denied Plaintiff's request for review on May 7, 2014. (R. at 1–5). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a

reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. RELEVANT MEDICAL EVIDENCE

Plaintiff stopped working in October 2009. (R. at 195). Prior to that time, she had been working part-time for several years and was laid off in 2009 due to lack of work; she continued to look for work but was unsuccessful. (*Id.*).

In November 2009, Plaintiff began treating with Richard Gainey, M.D. (R. at 308–09). On November 23, 2009, she reported that her joint pain had started 17 years prior but had gotten steadily worse in the last two years. (*Id.* at 308). Anti-inflammatories had been used with modest improvement. (*Id.*). On examination, Dr. Gainey found decreased range of motion in the cervical spine, particularly with lateral flexion and lateral rotation, and tenderness in the paraspinal muscles. (*Id.*). He also found "significant" tenderness in the lumbar spine, extending to both sacroiliac joint regions; slight acromioclavicular crepitus in both shoulders; slight tenderness in the right elbow; and slight tissue swelling in the hands. (*Id.* at 308–09). Dr. Gainey diagnosed osteoarthritis, inflammatory polyarthropathy and fibromyalgia, prescribed diclofenac, Plaquenil and tramadol, and ordered further tests.[3] (*Id.* at 309).

On December 22, 2009, Dr. Gainey noted that x-rays of the lumbar spine, hands, and knees were consistent with degenerative changes. (R. at 306). Plaintiff's lumbar pain was quite severe and prolonged. (*Id.*). She reported being unable to tolerate diclofenac and Plaquenil because of gastrointestinal and confusion issues and tra-

---

[3] Diclofenac is a nonsteroidal anti-inflammatory drug, and tramadol is a narcotic-like pain reliever, which is used to treat moderate to severe pain. <www.drugs.com> Plaquenil Sulfate (hydroxychloroquine) is used to treat symptoms of rheumatoid arthritis and discoid or systemic lupus erythematosus. <http://www.emedicinehealth.com/>

madol was not helpful. (*Id.*). On examination, Plaintiff had decreased range of motion in the cervical spine, significant tenderness in the lumbar spine, and slight tenderness in the shoulders, elbows and hands. (*Id.* at 306–07). Dr. Gainey diagnosed complex musculoskeletal disease with significant osteoarthritis, and mild inflammatory arthritis. (*Id.* at 307). He discontinued diclofenac, Plaquenil and tramadol, and started prednisone and Vicodin.[4] (*Id.*).

On February 17, 2010, Plaintiff reported significant difficulty after the diclofenac and Plaquenil were discontinued. (R. at 300). Vicodin helps for two to three hours, but her activity is severely limited by joint pain. (*Id.*). Dr. Gainey concluded that Plaintiff's primary impairment is inflammatory polyarthropathy, along with fibromyalgia and osteoarthritis. (*Id.* at 301). He continued Vicodin and prednisone and prescribed nabumetone and a Lidoderm patch.[5] (*Id.*).

On August 24, 2010, Dr. Gainey noted that radiological changes confirmed Plaintiff's osteoarthritis. (R. at 304). Plaintiff has continued pain particularly in the lower back region and increased myalgic discomfort with tenderness over the fibromyalgic zones. (*Id.*). She also has significant morning stiffness and fatigue, but tolerates her current medications. (*Id.*). On examination, Plaintiff continues to have decreased range of motion in her cervical spine, significant tenderness in her tho-

---

[4] Prednisone is a corticosteroid, which prevents the release of substances in the body that cause inflammation and suppresses the immune system. Vicodin contains a combination of acetaminophen and hydrocodone and is used to relieve moderate to severe pain. <www.drugs.com>

[5] Nabumetone is a nonsteroidal anti-inflammatory drug, which is used to relieve the symptoms of rheumatoid arthritis or osteoarthritis. <www.drugs.com>

racic spine and paraspinal muscles, extending to both sacroiliac regions, and tenderness in her shoulders, elbows and hands. (*Id.*). Dr. Gainey concluded that Plaintiff's primary impairment is fibromyalgia, along with inflammatory polyarthropathy and osteoarthritis. (*Id.* at 305). He prescribed Savella and continued Vicodin and nabumetone.[6] (*Id.*).

On November 15, 2010, Dr. Gainey opined that Plaintiff's myalgic pain was consistent with fibromyalgia and paraspinal muscle pain. (R. at 302). Plaintiff reported "dramatic" improvement with Savella but she was not completely pain-free. (*Id.*). She exhibited no range-of-motion improvement. (*Id.*). Dr. Gainey concluded that Plaintiff has a complex musculoskeletal disease with fibromyalgia markedly improved with Savella treatment; mild inflammatory arthritis with increased pain and swelling after activity; and osteoarthritis with paraspinal muscle involvement. (*Id.* at 303). He continued Vicodin and increased Savella dosage. (*Id.*).

On May 24, 2011, Plaintiff reported that the Savella treatment was no longer effective—she has recurrent discomfort, increased fatigue, and generalized myalgic pain. (R. at 298). While Vicodin helps her pain, it prevents her from performing her regular activities and routines. (*Id.*). Plaintiff also has recurrence of lateral epicondylitis in her left elbow, with increasing pain. (*Id.*). On examination, Plaintiff still has decreased range of motion in the cervical spice with significant stress pain from tenderness in her paraspinal muscles; significant tenderness in her lumbar spine,

---

[6] Savella (milnacipran) is used to treat the chronic pain caused by fibromyalgia. <www.drugs.com>

extending to both sacroiliac joint regions; slight acromioclavicular crepitus in both shoulders; tenderness in her left shoulder; swelling in her hands; crepitus in both knees; recurrent pedal edema; and markedly increased fibromyalgia tenderness. (*Id.* at 299). Dr. Gainey concluded that Plaintiff has complex rheumatological disease with generalized osteoarthritis, particularly in the lumbar spine with significant, severe pain; inflammatory arthritis in remission; fibromyalgia with articular and nonarticular pain; and significant fatigue. (*Id.*). He ordered x-ray studies, a possible MRI scan, and possible cortisone injections. (*Id.*). Dr. Gainey discontinued nabumetone because of gastric irritation, continued Vicodin, and increased the Savella dosage. (*Id.*).

In an adult function report completed on July 12, 2011, Plaintiff asserted that she is unable to stand or sit for long periods of time, suffers from general fatigue and short term memory loss, and is unable to concentrate. (R. at 213, 215). Because of her sore back, knees and hands, she has trouble lifting, squatting, bending, standing, walking, kneeling, climbing, and fingering. (*Id.* at 218). Plaintiff is able to walk only one block before needing a ten-minute rest to continue. (*Id.*). She is able to sit for only 45 minutes before her back gets too painful. (*Id.* at 223). Plaintiff is able to do light housekeeping but needs help getting out of the bathtub. (*Id.* at 214). Her hands are not strong enough to open jars. (*Id.* at 222). She is unable to carry groceries, laundry, or trash because of pain in her back and hips. (*Id.*). Her son has to remind her to take her medications. (*Id.* at 215).

In a disability report dated October 5, 2011, Plaintiff asserted that Vicodin causes her be shaky, unsteady and sleepy, and that Savella has led to short- and long-term memory loss. (R. at 243, 245). She also asserted that she is in severe pain every morning, is able to use her hands for only a few minutes before resting them for 20–30 minutes, cannot walk for longer than 5 minutes before needing to sit for 20–30 minutes, and cannot drive for more than 5 minutes. (*Id.* at 244).

On November 21, 2011, Plaintiff complained of memory loss and increasing discomfort with her medications but otherwise tolerating her present medications well. (R. at 333). X-ray findings showed mild degenerative change but no progression. (*Id.*). Dr. Gainey will consider MRI scan if symptoms increase. (*Id.*). He diagnosed inflammatory polyarthropathy, along with osteoarthritis and fibromyalgia. (*Id.* at 334). He opined that Plaintiff has a complex rheumatological disease with generalized osteoarthritis of the lumbar spine and significant discomfort from fibromyalgia. (*Id.*). Because of Plaintiff's complaints of memory loss, Dr. Gainey discontinued Savella, prescribed doxepin, and continued Vicodin.[7] (*Id.*).

On February 14, 2012, Plaintiff submitted another disability report. (R. at 249–53). She asserted that her back pain is worsening, her hands become useless after one to two minutes, and her memory loss is increasing. (*Id.* at 249). She stated that doxepin causes her to be thirsty, anxious, nauseous and sleepy, and Vicodin causes her to be sleepy, dopey, anxious and panic stricken. (*Id.* at 251). She needs help in and out of the tub; her son does the shopping and most household chores. (*Id.* at

---

[7] Doxepin is used to treat symptoms of depression and anxiety. <www.drugs.com>

252). She hardly drives anymore because she cannot sit for even short periods of time. (*Id*.).

In an activities of daily living report, dated August 20, 2012, Plaintiff asserted that after waking, she has severe pain in her back, hips, knees and neck; swelling in her hands and legs; and an inability to move for one to two hours after taking medications. (R. at 259). It is extremely difficult for her to go up and down stairs and her son does most of her household chores. (*Id*.). Plaintiff cannot sit for too long because of her hip pain. (*Id*.). She can drive for only a few blocks, if at all. (*Id*.). She cannot stand or walk for too long because of her back pain. (*Id*.). She has also been experiencing both long and short term memory loss, perhaps from her medications. (*Id*.).

On August 27, 2012, Plaintiff complained of severe lower back pain, extending to both hips and knees, along with the right hand and left foot. (R. at 519). On examination, Plaintiff exhibited decreased range of motion in the cervical spine, with stress pain and significant tenderness in the paraspinal muscles; significant tenderness in the lumbar spine, extending to both sacroiliac joint regions; slight acromioclavicular crepitus in both shoulders; tenderness in the left elbow; swelling in the hands; crepitus in both knees; slight pedal edema; and fibromyalgic tenderness persisting over costochondral junctions, trapezius and supraspinatus muscles, buttock muscles, and medial fat pads of the knee. (*Id*. at 519–20). Dr. Gainey diagnosed inflammatory polyarthropathy, osteoarthritis, fibromyalgia, and lateral epicondylitis. (*Id*. at 520). He concluded that Plaintiff has a complex rheumatologic disease with severe osteoarthritis involving the lumbar spine, knees and hips; inflammatory

arthropathy particularly involving the right hand with tenosynovitis; fibromyalgia with generalized and persistent articular and nonarticular pain; and lateral epicondylitis. (*Id.*). Dr. Gainey opined that Plaintiff "appears to be severely disabled by her combination of disease." (*Id.*).

At the November 2012 hearing, Plaintiff testified that she quickly becomes fatigued with any use of her arms. (R. at 54, 55). Her hands and wrist swell when she tries to use them, with sharp pains up to her elbow. (*Id.* at 55). Her hips and back are always painful, typically 8/10 on the pain scale even after taking her medications. (*Id.* at 59). During a typical day, Plaintiff sits or lies down until the pain causes her to get up and walk around for a while. (*Id.* at 59–60). She is able to stand for only 10–15 minutes at a time, sit for 20 minutes, walk one-half block, and carry and lift only a few pounds. (*Id.* at 60–61). She frequently dozes off during the day because of her chronic fatigue. (*Id.* at 65).

Plaintiff's son does most of the driving because of her wrist pain. (R. at 50). She periodically uses a cane to help her stand up or get out of the car. (*Id.* at 58). She is no longer able to do embroidery, knitting, or other craft projects because of the pain. (*Id.* at 60). Her son does most of the household chores. (*Id.* at 61). She plays cards every couple of weeks with her family but she can't shuffle the cards or sit too long without having to get up and move around. (*Id.* at 62–63).

At times, some of her medications cause severe memory loss. (R. at 54, 64–65). Vicodin makes her feel "zippy" and Ibuprofen causes elevated creatinine levels. (*Id.*

at 58, 64). She takes Zoloft for her depression and anxiety. (*Id.* at 63–64). She has trouble concentrating. (*Id.* at 66).

## V. DISCUSSION

Plaintiff contends that the ALJ's decision is not supported by substantial evidence because the ALJ (1) improperly analyzed her credibility, (2) improperly assessed her RFC, and (3) inadequately determined whether she meets or equals a listing. (Dkt. 14 at 8–15).

## A. The ALJ's Credibility Determination is Patently Wrong

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [his] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR)[8] 96-7p. An ALJ may not discredit a claimant's testimony about his symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d at 562 (citing SSR 96-7p; 20 C.F.R. § 404.1529(c)(2)); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("The administrative law judge cannot disbelieve [the

---

[8] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

claimant's] testimony solely because it seems in excess of the 'objective' medical testimony."). Even if a claimant's symptoms are not supported *directly* by the medical evidence, the ALJ may not ignore *circumstantial* evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); *see* 20 C.F.R. § 404.1529(c); SSR 96-7p.

The Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele*, 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele*, 290 F.3d at 942.

Plaintiff testified that she is able stand for only 10–15 minutes at a time, sit for 20 minutes, walk one-half block, and carry and lift only a few pounds. (R. at 60–61). She frequently dozes off during the day because of her chronic fatigue. (*Id.* at 65).

In her decision, the ALJ found that Plaintiff's allegations were "not credible." (R. at 29). Specifically, the ALJ concluded that (1) inconsistent testimony about Plaintiff's ability to sit "suggest that the information provided by [her] generally may not be credible;" (2) receiving unemployment compensation from the fourth quarter of 2010 through the third quarter of 2011 was "incompatible with [Plaintiff's] assertion that she was disabled at that time;" (3) the medical records indicate that Plaintiff's medications "have been relatively effective in controlling [her] symptoms;" and (4) tests undergone by Plaintiff "have all been rather unremarkable." (*Id.* at 25, 29–30),

Under the circumstances, none of the reasons provided by the ALJ for rejecting Plaintiff's credibility are legally sufficient or supported by substantial evidence. First, the ALJ failed to take into consideration that Plaintiff's inconsistent testimony about her ability to sit was, instead, consistent with her worsening conditions over time. In July 2011, Plaintiff asserted that she was able to sit for only 45 minutes before her back gets too painful. (R. at 223). In October 2011, she stated that she cannot walk for more than 5 minutes without needing to sit for 20–30 minutes. (*Id.* at 244). In February 2012, she asserted that her back pain was worsening—she needs help getting in and out of the tub and can hardly drive anymore because she cannot sit for even a short period of time. (*Id.* at 251). Contrary to the ALJ's contention that in August 2012, Plaintiff reported that she could sit for 45 minutes (*id.* at 25), Plaintiff merely stated that she "cannot sit for too long" because of her hip pain and drives for only a few blocks, if at all (*id.* at 259). This is con-

sistent with her November 2012 hearing testimony, where she asserted that she can sit for only 20 minutes. (*Id.* at 60–61). "An ALJ has the obligation to consider all relevant medical evidence and cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

The ALJ implied that Plaintiff admitted playing card games with her in laws, apparently sitting for three to four hours at a time. (R. at 25). But Plaintiff testified that she gets up frequently and cannot shuffle the cards because of the pain in her hands. (*Id.* at 63). The ALJ also stated that Plaintiff's driving undermines her testimony that she can sit for only 20 minutes. (*Id.* at 25). But Plaintiff consistently asserted that she rarely does any driving anymore. (*Id.* at 244 (cannot drive for more than five minutes), 252 (hardly driving anymore because she cannot sit for even short periods of time), 259 (can drive for only a few blocks, if at all), 50 (son does most of the driving)).

Second, Plaintiff's unsuccessful attempts to find part-time work following her asserted onset date (R. at 51, 195) does not undermine her disability claim. On the contrary, a claimant's "unsuccessful attempts to pursue various vocations might just as easily provide corroboration that [her] impairments significantly limited [her] ability to work, as opposed to evidence that [her] ability was greater than [she] alleged." *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011). And Plaintiff's agreement in drawing unemployment compensation that she is "ready, willing, and able" to work (R. at 29) does not necessarily mean that she is *capable* of *full-time*

work. *Cf. Jilinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[W]e are hard-pressed to understand how Jelinek's brief, part-time employment supports a conclusion that she was able to work a full-time job, week in and week out, given her limitations.").

Third, the ALJ's conclusion that Plaintiff's "medications have been relatively effective in controlling [her] symptoms" (R. at 29) is not supported by substantial evidence. Dr. Gainey systematically changed Plaintiff's medication regimen in a largely unsuccessful attempt to control her symptoms. (*See id.* at 308–09 (prescribing diclofenac, Plaquenil and tramadol in November 2009 to control Plaintiff's osteoarthritis, inflammatory polyarthropathy and fibromyalgia), 306–07 (discontinuing diclofenac, Plaquenil and tramadol, and started prednisone and Vicodin in December 2009 because Plaintiff could not tolerate diclofenac and Plaquenil because of gastrointestinal and confusion issues and tramadol was not helpful), 300–01 (continuing Vicodin and prednisone and prescribing nabumetone and a Lidoderm patch in February 2010 because Plaintiff reported significant difficulties after diclofenac and Plaquenil were discontinued), 304–05 (prescribing Savella in August 2010 after Plaintiff complained of continuing pain in lower back, increased myalgic discomfort with tenderness over fibromyalgic zones, and significant stiffness and fatigue), 302–03 (increasing Savella dosage in November 2010 after Plaintiff reported "dramatic" improvement but not pain-free), 298–99 (increasing Savella dosage in May 2011 after Plaintiff reported it was no longer effective—recurrent discomfort, increased fatigue and generalized myalgic pain—and discontinuing nabumetone because of gas-

tric irritation), 333–34 (discontinuing Savella in November 2011 because of memory loss complaints and prescribing doxepin), 519–20 (prescribing 800 mg Ibuprofen and continuing Vicodin and doxepin in August 2012 after Plaintiff complained of severe lower back pain, extending to both hips and knees)). Because of Plaintiff's complex rheumatologic disease with severe osteoarthritis involving the lumbar spine, knees and hips; inflammatory arthropathy particularly involving the right hand with tenosynovitis; fibromyalgia with generalized and persistent articular and nonarticular pain; and lateral epicondylitis, Dr. Gainey opined in August 2012 that Plaintiff "appears to be severely disabled by her combination of disease." (*Id.* 520). While the ALJ is correct that in November 2010, "Dr. Gainey noted [Plaintiff's] fibromyalgia tenderness was markedly improved (*id.* at 29; *see id.* at 302–03), Dr. Gainey's later examinations indicated that this improvement was only temporary (*see id.* at 299 (diagnosing fibromyalgia with articular and nonarticular pain in May 2011, along with significant fatigue), 519–20 (finding fibromyalgic tenderness in August 2012, persisting over costochondral junctions, trapezius and supraspinatus muscles, buttock muscles, and medical fat pads of the knee)).

Finally, the ALJ's finding that Plaintiff's "MRI's, x-rays, and . . . other test[s] . . . have all been rather unremarkable" (R. at 30) misapprehends the nature of Plaintiff's impairments. "There are no laboratory tests for the presence or severity of fibromyalgia. Its cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective." *Sarchet v. Chater*, 78 F.3d 305, 306 (7th Cir. 1996); *see Holmstrom v. Metro Life Ins. Co.*, 615 F.3d 758,

768–69 (7th Cir. 2010) (because no objective test exists for fibromyalgia, the plaintiff need not "prove her condition with objective data"); *accord Kuznowicz v. Wrigley Sales Co.*, No. 11 C 165, 2013 WL 4052381, at *14 (N.D. Ill. Aug. 12, 2013). "The pain and lack of sleep associated with fibromyalgia can interfere with [the] ability to function at home or on the job." <http:// www.mayoclinic.org/diseases-conditions/ fibromyalgia/basics/definition/con-20019243>. Further, the Commissioner has issued guidance for evaluating fibromyalgia claims that admonishes adjudicators to be aware of the fluctuating nature of symptoms, which will produce good and bad days, the need to evaluate credibility with care, and the importance of considering longitudinal records reflecting ongoing medical evaluation and treatment from medical sources. *See* SSR 12–2p.

Defendant contends that the ALJ properly discredited Plaintiff's credibility because she never sought out physical therapy. (Dkt. 22 at 9). But while the ALJ noted that Plaintiff never had physical therapy (R. at 26), this was not one of her reasons for discrediting Plaintiff's credibility (*id.* at 28–29). The Court must limit its review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943); *accord Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) ("We are particularly concerned about the *Chenery* violations committed by the government because it is a recurrent feature of the government's defense of denials of social security disability benefits, as this court has noted repeatedly."). In any event, even if the ALJ had given the failure to pursue physical therapy as a reason, it would have been improper because she did not give Plaintiff an opportunity to explain. *Murphy*

*v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014), as amended (Aug. 20, 2014) ("[A]n ALJ may need to question the individual at the administrative proceeding to determine whether there are good reasons the individual did not seek medical treatment or fully comply with prescribed treatment."); SSR 96–7p, at *7 ("The adjudicator may need to recontact the individual or question the individual at the administrative proceeding in order to determine whether there are good reasons the individual does not seek medical treatment or does not pursue treatment in a consistent manner.").

The Court finds the ALJ's credibility determination "patently wrong." *Craft*, 539 at 678. On remand, the ALJ shall reevaluate Plaintiff's complaints with due regard for the full range of medical evidence. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

## B. Other Issues

Because the Court is remanding to reevaluate Plaintiff's credibility, the Court chooses not to address Plaintiff's other arguments that the combination of Plaintiff's impairments meet or equal listing 12.09, and her RFC should include the effects of fibromyalgia in combination with her other impairments. (Dkt. 14 at 8–10, 14–15). However, on remand, after determining Plaintiff's credibility, the ALJ shall reevaluate whether her combination of impairments meet or equal listing 12.09. The ALJ shall then reevaluate Plaintiff's physical and mental impairments and RFC, considering all of the evidence of record, including Plaintiff's testimony, and shall explain the basis of her findings in accordance with applicable regulations and rulings. "In

making a proper RFC determination, the ALJ must consider all of the relevant evidence in the record, even limitations that are not severe, and may not dismiss a line of evidence contrary to the ruling." *Murphy*, 759 F.3d at 817 (citation omitted). Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment [13] is **GRANTED**, and Defendant's Motion for Summary Judgment [21] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: February 25, 2016

MARY M. ROWLAND
United States Magistrate Judge